980 So.2d 351 (2008)
Andre Deshon MIDDLETON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2007-KA-01023-COA.
Court of Appeals of Mississippi.
April 22, 2008.
*352 David L. Walker, Attorney for Appellant.
Office of the Attorney General by Deshun Terrell Martin, Attorney for Appellee.
Before MYERS, P.J., GRIFFIS and ROBERTS, JJ.
MYERS, P.J., for the Court.
¶ 1. Andre Deshon Middleton was convicted of felony child abuse in violation of Mississippi Code Annotated section 97-5-39(2) (Rev.2006) and sentenced to serve twenty-five years in the custody of the Mississippi Department of Corrections. Middleton now appeals that conviction, presenting four issues for review on appeal. Middleton's first three issues seek determination of whether the trial court erred in admitting certain expert testimony. Lastly, Middleton asks whether the trial court erred in denying his motion for a new trial or, in the alternative, a motion for a judgment notwithstanding the verdict.

FACTS AND PROCEDURAL HISTORY
¶ 2. On the morning of October 24, 2005, a baby was heard crying for about an hour at the Meadowview apartments. A neighbor, Robert Williams, testified that he heard the baby's cry that morning and also heard something go across the neighbor's floor. Williams then heard a loud thump, and the baby's cries stopped suddenly. A few moments later, Middleton was seen walking down the apartment steps with a child in his arms, I.W.,[1] approaching his Aunt Regina Middleton's apartment. Regina testified that Middleton brought I.W. to her apartment because the child was not breathing. Regina called 911 and instructed Middleton to administer CPR. I.W. was *353 taken by ambulance to Tri-Lakes Hospital. The emergency room doctor, Robert Smith, testified that I.W.'s right pupil was dilated more than the left, indicating possible brain injury. I.W. was less than a year old at the time of the injury. The emergency room transferred the child by helicopter to Le Bonheur Medical Center in Memphis, Tennessee for treatment, due to the difficulty I.W. had breathing and the severity of his injury.
¶ 3. Presently, I.W. is permanently injured and will likely never gain the ability to walk. I.W. is unable to eat solid foods or talk as a normal child of his age. He will likely be in special education classes and need treatment for the rest of his life.
¶ 4. Three experts testified for the State at trial regarding I.W.'s injuries. Dr. Gregory Stidham treated I.W. at the time he arrived at Le Bonheur Medical Center and also testified at trial as an expert for the State. Dr. Stidham is a pediatrician who specializes in critical care medicine. Dr. Thomas Boulden, a radiologist specializing in pediatric care, also testified at trial regarding his expertise in reading and evaluating x-rays, CT scans, and MRIs to provide a diagnosis. Dr. Karen Larkin, who offered her testimony as an expert in the field of pediatrics with a sub-specialty in child abuse, was the last expert to testify for the State. Each expert testified that I.W.'s injuries were sustained most likely as a result of Shaken Baby Syndrome.
¶ 5. Middleton objected to the testimony of Dr. Boulden, Dr. Stidham, and Dr. Larkin. Middleton argued that under the Daubert standard, Shaken Baby Syndrome is not a condition or theory that is generally accepted in the medical community. Middleton argued also that Dr. Boulden was not qualified to testify regarding the mechanism of injury to I.W. Middleton further argued Dr. Stidham was not qualified to testify regarding the characteristics of the injury to I.W. Middleton also objected to the testimony of Dr. Larkin because she had not physically examined I.W., having only reviewed the medical files at the time of her testimony. Middleton also objected to the testimony of Dr. Larkin because her work regarding I.W. had not been subject to peer review. At the close of the State's case, Middleton moved for a directed verdict, arguing that the State had presented insufficient evidence to prove its case. The trial court denied this motion. The jury subsequently found Middleton guilty of felonious child abuse. Middleton subsequently filed a motion for new trial or, in the alternative, a motion for a judgment notwithstanding the verdict. These were both denied by the trial court, and Middleton was sentenced, on June 6, 2007, to twenty-five years in the custody of the Mississippi Department of Corrections.

STANDARD OF REVIEW
¶ 6. "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." Smith v. State, 925 So.2d 825, 834 (¶ 23) (Miss.2006) (quoting Logan v. State, 773 So.2d 338, 346-47 (¶ 31) (Miss.2000)). An appellate court will only overturn a trial court's admittance of expert testimony if it can be said that "the [trial court's] discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." Roberts v. Grafe Auto Co., 701 So.2d 1093, 1098 (Miss.1997) (citing Seal v. Miller, 605 So.2d 240, 243 (Miss.1992)).
¶ 7. Further, we recognize that a motion for a new trial challenges the weight of the evidence, while a motion for a judgment notwithstanding the verdict challenges the *354 sufficiency of the evidence. Dilworth v. State, 909 So.2d 731, 736-37 (¶¶ 17-20) (Miss.2005). This Court must determine whether the trial court committed an abuse of discretion in denying Middleton's motion for a new trial. Id. at 737 (¶ 20) (quoting Howell v. State, 860 So.2d 704, 764 (¶ 212) (Miss.2003)). Further, this Court will only reverse a trial court's denial of a judgment notwithstanding the verdict if the trial court can be said to have abused its discretion. Id. at 736 (¶ 17) (citing Howell, 860 So.2d at 764 (¶ 212)).

DISCUSSION
¶ 8. At trial, the case centered on the testimony of three separate doctors regarding the injuries suffered by I.W. on October 24, 2005. The trial court allowed the testimony of all three medical doctors, finding that they sufficiently qualified as medical experts and would assist the jury in making its determination. Mississippi Rule of Evidence 702 controls the trial court's admittance of expert testimony and reads as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 9. "When determining admissibility of expert testimony, courts must consider whether the expert opinion is based on scientific knowledge (reliability) and whether the expert opinion will assist the trier of fact to understand or determine a fact in issue (relevance)." Edmonds v. State, 955 So.2d 787, 791 (¶ 5) (Miss.2007) (citing Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 38 (¶ 16) (Miss.2003)). In addition, the Mississippi Supreme Court stated that:
[t]he Daubert Court considered four general questions in determining the admissibility of expert testimony, namely (1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and, (4) whether the theory or technique has general acceptance.
Poole v. Avara, 908 So.2d 716, 722 (¶ 13) (Miss.2005) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). However, this list of factors is not exhaustive. Daubert, 509 U.S. at 591, 113 S.Ct. 2786.
¶ 10. In addition, with regard to questioning experts on theory or opinion, "[t]he Mississippi Supreme Court has held that `[t]he interrogator may frame his question on any theory which can reasonably be deduced from the evidence and select as a predicate therefor such facts as the evidence proves or reasonably tends to establish or justify.'" Wells v. State, 913 So.2d 1053, 1057 (¶ 7) (Miss.Ct.App.2005) (quoting Chapman v. Carlson, 240 So.2d 263, 268 (Miss.1970)).
¶ 11. All three of the doctors who testified stated that they could affirmatively rule out accidental injury as the cause of I.W.'s symptoms. All three doctors concluded that the cause of I.W.'s injuries was not of an accidental nature and the symptoms exhibited by I.W. pointed to some type of human intervention as the cause of I.W.'s injuries since there was no evidence of external force trauma. Thus, the State's proffered theory was that the injury to I.W. was intentionally caused by Middleton while the child was in his care. All three experts found this theory the most likely cause of I.W.'s injuries.
*355 ¶ 12. Additionally, the jury determined that Middleton was guilty of felonious child abuse based in part on the testimony of the three experts presented by the State. Again, this Court is cognizant that "[t]he jury is the sole judge of the credibility of witnesses." Kolberg v. State, 829 So.2d 29, 71 (¶ 116) (Miss.2002) (quoting Billiot v. State, 454 So.2d 445, 463 (Miss.1984)).
I. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. THOMAS BOULDEN REGARDING THE MECHANISM OR CAUSATION OF INJURY TO I.W.
¶ 13. Middleton argues that Dr. Boulden's testimony was beyond the scope of his expertise. Middleton argues that while Dr. Boulden is an expert with regard to reading x-rays, MRIs, and CT scans, he is not qualified to testify as an expert regarding the cause of the injury to I.W. Middleton asserts that the trial court erred in allowing his testimony regarding his theory as to the cause of I.W.'s injury. The State argues that Dr. Boulden was properly qualified as an expert in the field of pediatric radiology. The State further argues that it was permissible to allow Dr. Boulden to testify regarding the mechanism or causation of the injury based on his evaluations and reports recorded during I.W.'s treatment. We agree with the State and find that the trial court did not abuse its discretion in finding that Dr. Boulden was properly qualified as an expert to testify about the cause of the injury to I.W. and that his knowledge and testimony assisted the trier of fact in this case.
¶ 14. Dr. Boulden is a certified radiologist who specializes in the field of pediatric radiology. He is affiliated with Le Bonheur Children's Medical Center. At trial, Dr. Boulden was qualified as an expert in the field of pediatric radiology. Dr. Boulden testified at trial regarding his expertise in reading, evaluating, and diagnosing through his analysis of x-rays, CT scans, and MRIs.
¶15. I.W. received both CT scans and MRIs during his stay at Le Bonheur to help determine a diagnosis. Dr. Boulden was the pediatric radiologist who examined I.W.'s CT scans and MRIs during his stay at Le Bonheur. Dr. Boulden testified that I.W.'s CT scans revealed that there was blood between the two hemispheres of his brain, and further there were signs of atrophy of the brain due to injuries; the back of his brain was injured; and there were areas of bleeding on the surface of the brain. Dr. Boulden initially performed the CT scan on November 1, 2005, following the injury on October 24, 2005. Dr. Boulden testified that he estimated that all three brain injuries occurred on or after October 24, 2005. Dr. Boulden testified that the injury to I.W.'s brain, consisting of the presence of subdural hematomas, was consistent with or most likely due to shaking.
¶ 16. From the record before us, we find that Dr. Boulden was properly qualified as an expert witness in pediatric radiology. We further find that Dr. Boulden, as the treating pediatric radiologist, was properly allowed to testify to his impressions regarding the causes of the injuries, which he observed on the MRIs and CT scans of I.W. His initial reports were entered as exhibits, and he testified about those findings at trial. We cannot find error in the trial court's admission of his testimony, as it was helpful to the jury's determination.
II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. GREGORY STIDHAM.
¶ 17. Middleton argues that the trial court erred in allowing the testimony of *356 Dr. Stidham, who related that I.W.'s injuries were characteristic of Shaken Baby Syndrome. Middleton argued that Shaken Baby Syndrome is not a generally accepted theory in the medical community. Therefore, Middleton argues that testimony regarding Shaken Baby Syndrome should have been excluded because Dr. Stidham was not shown to be an expert in that field. The State argues that Dr. Stidham was well qualified to testify regarding pediatric trauma. The State argues that Dr. Stidham exhibited sufficient knowledge, skill, and experience to qualify as an expert regarding pediatric trauma. Additionally, the State argues that Dr. Stidham's knowledge was of assistance to the jury in this case.
¶ 18. Dr. Stidham is board certified in pediatrics and in pediatric critical care medicine. He is a professor of pediatrics at University of Tennessee Health Science Center in Memphis, Tennessee and is the Director of Critical Care Service and the Department of Respiratory Care at Le Bonheur Children's Medical Center. Dr. Stidham has also lectured on Shaken Baby Syndrome in Memphis, Tennessee.
¶ 19. At trial, Dr. Stidham testified that upon arrival, I.W. was in a comatose state, had to have assistance breathing, and exhibited signs of brain injury. Dr. Stidham additionally testified that there was no evidence of bruises or external trauma. A CT scan revealed that I.W. had a subdural hematoma, or a blood clot over the surface of his brain, and brain swelling, causing I.W.'s comatose state. Dr. Stidham related that he found neurological damage when he examined I.W., meaning that his brain was not functioning normally, and further that he found hemorrhages of the retina. Dr. Stidham additionally explained that the retinal hemorrhages, which are blood vessels in the back of the eye that rupture and bleed, could only be caused by either a massive crush injury to the brain, likened to having a person's head run over by a car, or by Shaken Baby Syndrome. Dr. Stidham testified that because there were no external marks or signs of trauma, that excluded any type of forcible trauma like falling or being hit with an object on the head. Dr. Stidham further related that he could exclude illness, falls, or an object hitting the baby as the cause of the brain injury. He additionally stated that the injuries were severe in nature and put I.W. in serious danger. His testimony concluded that he could rule out external injury to I.W., and as a result, the symptoms could meet the characteristics of Shaken Baby Syndrome.
¶20. Although Middleton argues that Shaken Baby Syndrome is not widely accepted by the medical community, and also that courts of this state have not acknowledged Shaken Baby Syndrome as an area where an expert may be qualified to testify, we disagree. Here, the testimony by all three doctors acknowledged that in their medical opinion, Shaken Baby Syndrome appeared to be the most likely cause of I.W.'s severe brain injury. All three doctors clearly identified and defined the type of injuries present and clearly identified their basis for concluding the injury was most likely caused by adult intervention, i.e., the strong possibility that I.W.'s injuries were non-accidental in nature.
¶ 21. In Wells, 913 So.2d at 1057-58 (¶¶ 8-9), there was no error found in the trial court's decision to allow testimony from a medical doctor based on the doctor's knowledge, experience, and previous treatment of the child to render an opinion, by answering hypothetical questions posed by counsel, as to whether the head trauma was the result of an accident or was instead the result of felonious child abuse. The CT scans showed the presence *357 of retinal hemorrhaging. Id. The pediatrician opined that the type of injury suffered by the child was more commonly associated with Shaken Baby Syndrome than any other potential cause. Id. Further, in Wells, this Court found that the doctor first examined the child and diagnosed the child based upon his training in pediatric medicine and further offered his opinion as to the nature of the injuries. Id. at 1057-58 (¶ 9). The Court in Wells ultimately held that the doctor's testimony that the injury was non-accidental in nature was proper since it was: "(1) was based upon his medical evaluation of [the child], (2) was the product of reliable principles and methods of medicine, and (3) those principles and methods were reliably applied to the facts of this case." Id. at 1058 (¶ 9).
¶ 22. Here, the State questioned Dr. Stidham extensively regarding what type of trauma would likely cause the injuries suffered by I.W. The State questioned Dr. Stidham regarding whether there was proof that illness, a car wreck, a baseball bat, a fall from a great height likely caused the injuries to I.W. Dr. Stidham answered that all of these potential causes could be ruled out by the medical report and evidence he observed when examining I.W. Dr. Stidham further testified that the combination of the type of injuries sustained by I.W. would most commonly be a characteristic of Shaken Baby Syndrome. In addition, Dr. Stidham relied on his earlier treatment and medical records, regarding I.W.'s condition upon the child's arrival at Le Bonheur, in support of his testimony.
¶ 23. Here, this Court finds no error in the trial court's admission of Dr. Stidham as an expert. Dr. Stidham was well qualified to present testimony as an expert in the field of pediatrics. Dr. Stidham also has over thirty publications regarding his specialty, and he has given many lectures regarding pediatrics and pediatric trauma, and he has lectured on Shaken Baby Syndrome. Dr. Stidham also testified that the theory of Shaken Baby Syndrome is a widely accepted theory, but he also admitted there are a few well-respected physicians who disagree regarding the theory.
¶ 24. We find that the trial court was correct in its qualification of Dr. Stidham as an expert in the area of pediatric trauma. We also find that the testimony Dr. Stidham, I.W.'s treating physician during his first several days at Le Bonheur Children's Medical Center, was relevant. Dr. Stidham related his initial observations and treatment of I.W., which was helpful to the jury in its determination of how the child suffered the severe brain injuries on October 24, 2005. Therefore, we find that the trial court did not err in allowing Dr. Stidham to testify as an expert.
III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. KAREN LARKIN.
¶ 25. Middleton argues on appeal that the trial court erred in allowing Dr. Karen Larkin to testify regarding child abuse injuries. Middleton objected because Dr. Larkin had not physically examined I.W., but only evaluated I.W.'s medical records. Middleton further objected to the testimony because her work was not peer reviewed and because she lacked board certification in child abuse.
¶ 26. The State argued at trial and now on appeal that there were already two other experts testifying who had previously examined and treated I.W.; therefore, a physical examination by Dr. Larkin was unnecessary. The State additionally pointed out that there was no ability to achieve board certification in child abuse and neglect, and certification examinations would not be available until 2009. Further, the *358 State presented testimony from Dr. Larkin that when board certification for child abuse did become available, she would be grandfathered into the board certification program without taking examinations since she had already practiced in the field of child abuse and neglect for over five years.
¶ 27. Dr. Larkin is a pediatrician, an assistant professor of pediatrics at the University of Tennessee and Le Bonheur Children's Hospital, and the medical director for the Child Protection Team at Le Bonheur. The Child Protection Team's purpose is to evaluate children that arrive at Le Bonheur with unexplained injuries. Dr. Larkin is also board certified in pediatrics. She has had further specialized training regarding child abuse. Dr. Larkin is qualified as a medical expert witness in child abuse cases in Mississippi, which means she has had training in the field of child abuse and neglect and testifies at trial regarding those subjects.
¶ 28. Dr. Larkin testified at trial that I.W. suffered a subdural hematoma; that I.W. suffered from apnea, meaning I.W. stopped breathing; and there was evidence of retinal hemorrhaging. The retinal hemorrhage on the left side, or bleeding and ruptures of the vessels in the back of the eye, was documented by a pediatric ophthalmologist. Dr. Larkin testified that I.W. also suffered seizures. Dr. Larkin ruled out accident as a possible cause of I.W.'s injuries. From her observation there was no external trauma or bruising. Dr. Larkin concluded that the injuries to I.W. were severe and were a result of abuse or human intervention.
¶ 29. With regard to the basis of opinion testimony by experts, Rule 703 provides that:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
M.R.E. 703. While Dr. Larkin did not physically examine I.W., she instead relied on the medical records to support her testimony. Under Mississippi Rule of Evidence 703, this reliance is permissible. Dr. Larkin was properly qualified as an expert in the field of pediatric care, specifically with regard to child abuse. Dr. Larkin testified as to her opinion regarding the nature and possible causes of I.W.'s injuries, which is proper.
¶ 30. While Middleton complains on appeal that Dr. Larkin's work on this particular testimony regarding I.W. had not been subject to review, we note that "[p]eer review by publication remains only one factor on a non-exhaustive list of factors for admissibility under evidence rules with a liberal thrust." Poole, 908 So.2d at 724 (¶ 17). Additionally, "[t]hough helpful when present, publication and peer review are not absolutely required; their absence does not constitute automatic inadmissibility." Id. Although Middleton claims the trial court erred in admitting the testimony of all three experts, Middleton had the opportunity to discredit the expert's theories by his cross-examination of the experts. We note that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596, 113 S.Ct. 2786).
¶ 31. Further, we find no merit to Middleton's argument that since there is not yet board certification for child abuse and neglect, then Dr. Larkin cannot qualify as an expert in child abuse. In fact, the Mississippi Supreme Court in Hall v. *359 State, 611 So.2d 915, 920 (Miss.1992) qualified an expert witness in child abuse, although in that case the abuse was sexual in nature. The court in Hall found that the two doctors who testified regarding the child abuse were well qualified to do so and, thus, properly accepted their testimony. Id. Additionally, in Hobgood v. State, 926 So.2d 847, 855 (¶ 26) (Miss.2006), Hobgood argued that "no witness may be qualified as an expert in the field of child sexual abuse." The Mississippi Supreme Court disagreed, finding that an expert in child sexual abuse may testify about common characteristics associated with child sexual abuse unless "its probative value is substantially outweighed by the potential for unfair prejudice or confusion of the jury." Id. at 856 (¶ 27) (citing Hall, 611 So.2d at 919).
¶ 32. From a reading of the record and from a reading of Dr. Larkin's curriculum vitae, we find her testimony regarding child trauma and abuse was appropriate, and the trial court did not err in allowing her testimony. Accordingly, this issue is without merit.
IV. WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, THE MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT.
¶ 33. Middleton argues that the trial court erred in denying his motion for a new trial or, in the alternative, his motion for a judgment notwithstanding the verdict (JNOV). Middleton argues on appeal that the State failed to present any evidence that a witness observed Middleton shaking I.W. Middleton argues that the guilty verdict goes against the great weight of the evidence and also that the evidence is insufficient to support the verdict. Middleton contends that his motion for a new trial should have been granted, arguing that the testimony concerning Shaken Baby Syndrome should have been excluded.
¶ 34. The State argues that the jury had the benefit of hearing and examining all the evidence, exhibits, and testimony before it. The State asserts that the jury verdict should stand, and Middleton's motion to grant a new trial should be denied, as the verdict was not against the great weight of the evidence. The State contends that Middleton's motion for a JNOV also should not be granted since there was sufficient evidence to support the conviction.
¶ 35. As noted earlier, a motion for a new trial challenges the weight of the evidence, while a motion for JNOV challenges the sufficiency of the evidence. Dilworth, 909 So.2d at 736-37 (¶¶ 17-20). In reviewing the trial court's denial of a motion for a new trial, this Court must discern whether "[t]he verdict [is] `so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" Id. at 737 (¶ 21) (quoting Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005)). Only where the "`evidence preponderates heavily against the verdict' should the trial court invade the province of the jury and grant a new trial." Id. (quoting Amiker v. Drugs for Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 36. In reviewing the denial of a motion for JNOV, an appellate court must determine, by viewing the evidence in the light most favorable to the nonmoving party, whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Brown v. State, 907 So.2d 336, 339 (¶ 8) (Miss. 2005). Most importantly, "the critical inquiry is whether the evidence shows `beyond a reasonable doubt that [the] accused *360 committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" Dilworth, 909 So.2d at 736 (¶ 17) (citing Carr v. State, 208 So.2d 886, 889 (Miss.1968)).
¶ 37. We find no merit in the argument that the trial court erred in failing to grant Middleton a new trial. We cannot say that the verdict goes against the great weight of the evidence. Here, several competent expert witnesses, some of whom treated I.W., testified regarding the injuries sustained by the victim. Further, several lay witnesses, including Middleton's aunt, family members of I.W., and a neighbor, testified to what they observed on the day I.W. suffered his injuries. The jury considered all of the evidence and testimony presented at trial and found Middleton guilty.
¶ 38. Additionally, we cannot find the trial court erred in denying Middleton's motion for JNOV. Here, the evidence cannot be said to be insufficient to support the verdict, as the witnesses and evidence presented at trial were sufficient. Accordingly, we affirm the ruling of the trial court.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY OF CONVICTION OF FELONY CHILD ABUSE AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANOLA COUNTY.
KING, C.J., LEE, P.J., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
NOTES
[1] The Mississippi Court of Appeals does not reveal the names of child abuse victims.