# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01106-COA

CAROL GRAY                                                                            APPELLANT

v.

DIMITRIOS DIMITRIADES, M.D., MEMORIAL                    APPELLEES
HOSPITAL AT GULFPORT AND TODD
FRIEZE, M.D.

DATE OF JUDGMENT:                 07/09/2014
TRIAL JUDGE:                      HON. LAWRENCE PAUL BOURGEOIS JR.
COURT FROM WHICH APPEALED:        HARRISON COUNTY CIRCUIT COURT,
                                  FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:          JONATHAN B. FAIRBANK
                                  JOHN F. HAWKINS
                                  EDWARD GIBSON
ATTORNEYS FOR APPELLEES:          ROLAND F. SAMSON III
                                  STEPHEN WALKER BURROW
                                  JAMES H. HEIDELBERG
NATURE OF THE CASE:               CIVIL - MEDICAL MALPRACTICE
TRIAL COURT DISPOSITION:          GRANTED SUMMARY JUDGMENT IN
                                  FAVOR OF APPELLEES
DISPOSITION:                      AFFIRMED - 06/07/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., FAIR AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     In May 2009, a biopsy of Carol Gray's spine showed that she had multiple myeloma,

a form of bone cancer. The results were sent to Dr. Eric Graham, the orthopedic surgeon

who performed the biopsy, but Dr. Graham failed to communicate the results to Gray. Over

one year later, another doctor discovered the biopsy results in Gray's medical records and

shared with Gray, for the first time, that she had bone cancer. Gray alleges that she suffered

additional fractures and bone lesions as a result of her doctors' failure to diagnose her with multiple myeloma. Gray filed a medical malpractice complaint in the Harrison County Circuit Court against Dr. Graham; nurse practitioner Michelle Graham; Dr. Dimitrios "Jimmy" Dimitriades, her former doctor, a family medicine practitioner; Dr. Dimitriades's employer, Memorial Hospital Gulfport (MHG); and Dr. Todd Frieze, an endocrinologist. The defendants subsequently filed separate motions for summary judgment, which the circuit court granted in separate orders, all of which Gray has appealed.

¶2.　Gray's appeal from the order granting summary judgment in favor of the Grahams came to this Court first because the circuit court certified that order as a final judgment pursuant to Mississippi Rule of Civil Procedure 54(b). We reversed and remanded in that appeal because we concluded that Gray's evidence was sufficient to create a genuine issue of material fact as to whether the Grahams' negligence was a proximate cause of her subsequent injuries. *Gray v. Graham*, 2014-CA-00069-COA, 2016 WL 382966 (Miss. Ct. App. Feb. 2, 2016) (motion for rehearing filed Feb. 2, 2016). This appeal involves the remaining defendants—Dr. Freeze, Dr. Dimitriades, and MHG. We affirm the orders granting summary judgment in favor of these defendants because we agree with the circuit court that the affidavit of Gray's expert, Dr. Bruce Avery, failed to create a genuine issue of material fact as to whether either Dr. Frieze or Dr. Dimitriades deviated from the standard of care, and whether their alleged negligence proximately caused any injury to Gray.

**FACTS AND PROCEDURAL HISTORY**

2

¶3. Gray's first appointment with Dr. Dimitriades, a family medicine practitioner, was in July 2008. At that appointment, Dr. Dimitriades ordered a CBC (complete blood count) and metabolic panel, which revealed that Gray had a low red blood cell count (anemia). Gray had an appointment with another doctor in Dr. Dimitriades's clinic in November 2008. The results of a test administered at the appointment indicated that Gray was still anemic and that her total protein level was "borderline high."

¶4. On November 26, 2008, Gray had another appointment with Dr. Dimitriades and complained of back pain. Dr. Dimitriades ordered an x-ray, which revealed she had fractured the T-7 vertebra of her spine. Dr. Dimitriades referred Gray to Dr. Graham, an orthopedic surgeon, to repair the fracture.

¶5. On January 15, 2009, Dr. Graham ordered an MRI, which confirmed Gray's T-7 fracture, but did not show any lytic lesions. (Lytic lesions are a possible sign of bone cancer.) Dr. Graham recommended surgery to repair the fracture.

¶6. On February 18, 2009, Dr. Graham performed surgery (kyphoplasty) and successfully repaired Gray's T-7 fracture. During the procedure, Dr. Graham biopsied a small part of the fractured vertebrae. The biopsy results showed "only bone fragments and blood," indicating a normal biopsy. The results were sent to both Dr. Graham and Dr. Dimitriades.

¶7. On April 30, 2009, an MRI of Gray's spine revealed a fracture of her T-5 vertebra. The MRI, again, did not indicate any lytic lesions. On May 13, 2009, Dr. Graham performed surgery (kyphoplasty) to correct Gray's T-5 fracture. He also biopsied a portion of the

3

fractured vertebra.

¶8.     The results of this second biopsy revealed plasma cells in Gray's bone marrow to a degree consistent with a diagnosis of multiple myeloma or plasmacytoma.  The results were sent to Dr. Graham.  Gray followed up with Dr. Graham on June 4, 2009, and January 29, 2010.  However, Gray alleges that Dr. Graham did not inform her of the results of her second biopsy during either appointment.

¶9.     The results of Gray's second biopsy were *not* sent to Dr. Dimitriades.  Dr. Dimitriades denies that he ever saw the results, and there is no evidence to the contrary.  Gray saw Dr. Dimitriades on May 27, 2009, and underwent a bone mineral density exam.  The results indicated normal bone density and low fracture risk.  Gray followed up with Dr. Dimitriades on June 19, 2009; June 24, 2009; September 1, 2009; and January 13, 2010.  Lab work ordered by Dr. Dimitriades during these visits continued to show that Gray was anemic.

¶10.    Sometime prior to July 21, 2009, Gray was referred to Dr. Frieze, an endocrinology specialist.  On July 21, 2009, Gray presented to Dr. Frieze "carrying a diagnosis of post-menopausal osteoporosis," and Dr. Frieze allegedly received "all labs from Dr. Dimitriades." The summary judgment record contains no additional information concerning Dr. Frieze's treatment of Gray.  There is no evidence that Dr. Frieze saw or treated her other than during this one appointment in July of 2009.  There is also no evidence that Dr. Frieze ever received the results of Gray's May 2009 biopsy.

¶11.    On January 22, 2010, Gray went to see Dr. Sean Kerby for the first time.  At this

point, Dr. Kerby apparently replaced Dr. Dimitriades as Gray's primary treating physician. Gray alleges she complained of chest pain to Dr. Kerby and that he diagnosed her with costochondritis, an inflammation of cartilage in the ribs.

¶12.   Gray alleges that she saw Dr. Kerby again in May 2010, and that he diagnosed her with cellulitis. When her cellucitis did not improve with antibiotics, Dr. Kerby sent Gray to the emergency room at Garden Park Hospital.

¶13.   At a follow-up appointment with Dr. Kerby on June 7, 2010, Dr. Kerby informed Gray that the May 2009 biopsy taken by Dr. Graham indicated that she had multiple myeloma. Dr. Kerby recommended that Gray see an oncologist. According to Gray, this was the first time she learned that she might have cancer. The record is unclear as to how Dr. Kerby became aware of the May 2009 biopsy or why he first discussed it with Gray on June 7, 2010. Dr. Kerby's notes also reflect a fracture of the T-10 vertebra.

¶14.   Three weeks later, Gray began receiving treatment for multiple myeloma at the M.D. Anderson Cancer Center in Houston, Texas. In addition to multiple myeloma, doctors at M.D. Anderson diagnosed Gray with fractures at T-4, T-8, T-10, L-1, and L-2 and noted numerous bony lesions. CT scans and a complete bone scan performed at M.D. Anderson indicated that additional fractures were consistent with multiple myeloma and were "most likely due to pathological fractures from myelomatous involvement." Gray has responded well to treatment at M.D. Anderson, has achieved a partial remission, and has suffered no additional fractures or lesions.

5

¶15. On April 14, 2011, Gray filed a complaint alleging malpractice against Dr. Graham, Nurse Graham, Dr. Dimitriades, MHG, and Dr. Frieze.

¶16. In March 2012, the Grahams moved for summary judgment. In December 2013, the circuit court granted the Grahams' motion on the ground that the opinions of Gray's expert on causation—Dr. Avery, an oncologist—were conclusory in nature and insufficient to create a genuine issue of material fact. The circuit court certified the order granting summary judgment in favor of the Grahams as final under Rule 54(b), and Gray timely appealed.

¶17. In January 2014, Dr. Dimitriades/MHG and Dr. Frieze moved for summary judgment. Although Gray had filed Dr. Avery's affidavit in March 2012 in opposition to the Grahams' motions for summary judgment, the remaining defendants pointed out that Gray had never designated Dr. Avery as an expert with respect to her claims against them, or disclosed the substance of Dr. Avery's opinions concerning them. *See* M.R.C.P. 26(b)(4)(A)(i). Accordingly, they argued that Gray had no competent evidence of the applicable standard of care, negligence, or proximate causation. In response, Gray supplemented her interrogatory responses and submitted a supplemental affidavit from Dr. Avery.[1] The defendants then argued that Dr. Avery's affidavits still failed to create a genuine issue of material fact as to the essential elements of Gray's claims. Dr. Frieze also argued that Dr. Avery, an oncologist,

---

[1] The defendants moved to strike Dr. Avery's supplemental affidavit. However, the record does not reflect a ruling on that motion, the circuit court considered and addressed the supplemental affidavit in its rulings on the merits, and the defendants have not raised the issue on appeal. Accordingly, we will also consider both of Dr. Avery's affidavits.

6

was not qualified to render opinions concerning the care provided by an endocrinologist, such as himself.

¶18. In July 2014, the circuit court entered orders granting summary judgment to the remaining defendants. As to Dr. Dimitriades, the court observed that the "crux" of Gray's theory was that the fractures and bony lesions discovered at M.D. Anderson in June 2010 would have been prevented if she had been "timely informed of the May 13, 2009 biopsy results." However, as the court noted, there is no evidence that those results were ever sent to Dr. Dimitriades. The court also found there were a "number of deficiencies" in Dr. Avery's opinions, including that Dr. Avery could not explain when Dr. Dimitriades should have ordered additional testing or what those tests would have revealed. In the court's view, Dr. Avery could offer only a "conclusory statement that [such testing] would have confirmed a diagnosis of multiple myeloma." The court therefore concluded that Dr. Avery's affidavits failed to create a genuine issue of fact with respect to either an alleged breach of the standard of care or proximate causation.

¶19. As to Dr. Frieze, the court first ruled that Dr. Avery was not qualified to opine as to the standard of care owed by a reasonably prudent endocrinologist. The court also concluded that Dr. Avery failed to explain, other than in a conclusory and speculative fashion, what additional testing Dr. Frieze should have performed or what those tests would have shown. In addition, the court noted that Dr. Avery opined that Gray could have avoided additional fractures if she had been "timely informed" of her May 13, 2009 biopsy results; however, Dr.

7

Frieze never saw those results and did not even treat Gray until July 21, 2009. The court concluded that Dr. Avery failed to account for this timing difference; instead, Dr. Avery simply "lump[ed] every defendant together" and then asserted that they all proximately caused Gray's injuries.

¶20. Gray timely appealed the orders granting summary judgment in favor of Dr. Dimitriades/MHG and Dr. Frieze. Gray filed her reply brief in this second appeal just after oral argument in the first appeal, *Gray v. Graham*. Just prior to oral argument in this appeal, we issued our ruling in *Gray v. Graham*. The only issue that we addressed in that opinion was whether Dr. Avery's affidavit was sufficient to create a genuine issue of material fact on the question whether *the Grahams' alleged negligence* proximately caused injury to Gray. The date of the alleged negligence at issue in that appeal was also easy to pinpoint: on May 14, 2009, the results of Gray's biopsy, which indicated that she had cancer, were sent to the Grahams, but the Grahams failed to communicate the results to Gray. *Gray*, 2016 WL 382966, at *1 (¶2). The issues in this appeal are materially different.

## STANDARD OF REVIEW

¶21. We review an order granting summary judgment de novo. *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 483 (¶10) (Miss. 2006). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Id.* Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

8

to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The non-moving party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e).

**DISCUSSION**

¶22. In a medical malpractice case, it is the plaintiff's burden to prove

> the following elements: (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant.

*Hubbard v. Wansley*, 954 So. 2d 951, 956-57 (¶12) (Miss. 2007). Expert testimony typically is required to establish each element of the plaintiff's case. *Id.* at 957 (¶12). "The appropriate standard of care in a medical malpractice case is objective and centers around exercising the degree of care, diligence, and skill ordinarily possessed and exercised by a minimally competent and reasonably diligent, skillful, careful, and prudent physician in that field of practice." *Bickham v. Grant*, 861 So. 2d 299, 303 (¶14) (Miss. 2003).

¶23. "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Hubbard*, 954 So. 2d at 957 (¶12) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)). "On the critical causation question, 'recovery is allowed only when the failure of the physician to render the required

9

level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition.'" *King v. Singing River Health Sys.*, 158 So. 3d 318, 324 (¶26) (Miss. Ct. App. 2014) (quoting *Ladner v. Campbell*, 515 So. 2d 882, 888 (Miss. 1987)). Thus, "[a] plaintiff cannot recover by showing a mere possibility of a 'chance of recovery.' . . . [T]he plaintiff must offer proof of 'a greater than fifty (50) percent chance of a better result than was in fact obtained.'" *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508-09 (¶12) (Miss. 2015) (quoting *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985); *Hubbard*, 954 So. 2d at 964 (¶42)).

¶24. On appeal, Gray contends that she presented evidence in support of each essential element of her claims against Dr. Frieze and Dr. Dimitriades/MHG and that the circuit court therefore erred in granting summary judgment. We address Gray's claims against Dr. Frieze and Dr. Dimitriades/MHG separately below.

### A. Dr. Frieze

¶25. Dr. Avery's affidavit recites that Gray had one appointment with Dr. Frieze—on July 21, 2009. There is no evidence in the summary judgment record that Dr. Frieze saw Gray on any other date. Gray was referred to Dr. Frieze for treatment for post-menopausal osteoporosis.

¶26. Dr. Avery's affidavit asserts that Dr. Frieze was negligent because he did not inform Gray of the results of her "May 13, 2009, biopsy of which Dr. Frieze had notice." However, there is no evidence that Dr. Frieze was provided with those results or was even aware that

10

the biopsy had occurred. Accordingly, Gray cannot survive summary judgment on the basis of this unsupported assertion by Dr. Avery. The most relevant test results of which Dr. Frieze had notice were Gray's two MRIs that revealed no lytic lesions and the normal results of her February 2009 biopsy.

¶27. The question, then, is whether there is any non-speculative, non-conclusory *evidence* from which a reasonable juror could find *both* (a) that a minimally competent and reasonably prudent doctor would have ordered tests that led to a diagnosis of cancer based solely on Gray's presentation to Dr. Frieze on July 21, 2009, *and* (b) that, more likely than not, such testing would have identified the cancer in time to prevent the additional fractures that Gray suffered prior to her treatment at M.D. Anderson. If not, then the circuit court correctly granted summary judgment in favor of Dr. Frieze. *See Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1274 (¶20) (Miss. 2007).

¶28. Aside from unsupported suggestions that Dr. Frieze was provided with the results of Gray's May 2009 biopsy, Dr. Avery offers only the following opinion concerning Dr. Frieze's alleged breach of the standard of care:

> When Gray presented to Dr. Frieze with refractory anemia, bone pain, and idiopathic fractures, the standard of care required a reasonably prudent endocrinologist to further investigate potential causes of the refractory anemia and thoracic fractures. Specifically, Dr. Frieze should have done further testing to determine protein levels in the blood and urine such as a serum and urine electrophoresis. Had Dr. Frieze conformed to the standard of care, I opine to a reasonable degree of medical certainty that he would have documented results that led to further studies to confirm the diagnosis of Multiple Myeloma such as a bone marrow examination . . . .

11

¶29. It is important to remember that Gray was referred to Dr. Frieze for treatment of post-menopausal osteoporosis, and the summary judgment record only shows that Gray saw Dr. Frieze on one occasion. Dr. Avery's affidavit fails to explain why a reasonably prudent endocrinologist would not have simply treated Gray for osteoporosis—at least initially or until such treatment first proved ineffective. Dr. Avery fails to explain how or why Dr. Frieze should have leapt from that diagnosis to a cancer diagnosis. Nor does Dr. Avery explain what the results of tests to determine protein levels would have told a reasonably prudent physician in Dr. Frieze's shoes. A conclusory expert affidavit that fails to explain the underlying "how, when, and why" is insufficient to withstand summary judgment. *Perez v. Univ. of Miss. Med. Ctr.*, 75 So. 3d 609, 611-12 (¶¶13, 16) (Miss. Ct. App. 2011) (quoting *Dalton v. Cellular S. Inc.*, 20 So. 3d 1227, 1234 (¶16) (Miss. 2009)).

¶30. Dr. Avery's affidavit also fails to create a genuine question of fact on the issue of causation. In *Gray v. Graham*, we concluded that there was a genuine issue of material fact as to whether the Grahams' alleged negligence proximately caused injury to Gray because we concluded that there was evidence from which a reasonable juror could find (a) that Gray suffered additional fractures *sometime after May 14, 2009*, when the Grahams failed to inform her of the results of her biopsy, and (b) that, more likely than not, those injuries would have been prevented had she begun treatment in May 2009. *See Gray*, 2016 WL 382966, at *1, *4 (¶¶2-3, 14).

¶31. Here, in contrast, Dr. Frieze did not even see Gray until more than two months after

12

the Grahams' alleged negligence. Furthermore, Dr. Avery's affidavit does not assert that Dr. Frieze should have diagnosed Gray's multiple myeloma immediately based on her presentation on July 21, 2009; rather, Dr. Avery asserts that Dr. Frieze should have ordered tests, reviewed the results, ordered additional tests, and reviewed the results prior to reaching that eventual conclusion at some unspecified later date. Dr. Avery does not explain *how long* after July 21, 2009, that testing process would have taken, and there is no evidence in the record as to *when*, between May 2009 and June 2010, Gray experienced additional fractures. Therefore, there is no basis in the evidence for a reasonable juror to find that additional testing and an eventual diagnosis by Dr. Frieze would have prevented the additional fractures that Gray experienced. As the circuit court observed, Dr. Avery simply "lumps every defendant together" despite significant factual differences in the claims against them. As a result, Gray's claim that Dr. Frieze's alleged negligence was the proximate cause of any of her injuries remains in the realm of speculation. Because "proximate cause requires more than speculation, guesswork, conjecture, or inferences," *Martin v. St. Dominic-Jackson Mem'l Hosp.*, 90 So. 3d 43, 50 (¶18) (Miss. 2012), the circuit court did not err by concluding that Gray failed to create a genuine issue of fact on the issue of proximate causation.[2]

### B.    Dr. Dimitriades

---

[2] Because we conclude that the substance of Dr. Avery's affidavit was insufficient to survive summary judgment, it is unnecessary to address the circuit court's determination that Dr. Avery was not qualified to render opinions concerning the standard of care for an endocrinologist.

¶32. As described above, Dr. Dimitriades, a family medicine physician, referred Gray to an orthopedic specialist, Dr. Graham, after he diagnosed a T-7 fracture. Dr. Dimitriades knew that Dr. Graham performed surgery to repair the fracture, and he also knew that the results of the biopsy taken during the February 2009 surgery were normal, i.e., the results did not indicate that Gray had multiple myeloma. In addition, MRIs of Gray's spine on January 15, 2009, and April 30, 2009, did not indicate the presence of any lytic lesions, which also indicated that Gray did not have multiple myeloma.

¶33. Dr. Avery asserts that Dr. Dimitriades "had notice" of the results of Gray's May 13, 2009 biopsy and negligently failed to communicate those results to her. However, as with Dr. Frieze, there is no evidence to support Dr. Avery's accusation. The evidence shows that the results of the second biopsy were sent to Dr. Graham alone. Accordingly, Dr. Avery's unsupported assertion will not suffice to defeat summary judgment.

¶34. Even though the evidence shows that Dr. Dimitriades received two MRIs and the results of one biopsy indicating that Gray did not have multiple myeloma, Dr. Avery asserts that Dr. Dimitriades committed malpractice for the following reasons:

> When Mrs. Gray's anemia did not respond to treatment, and when Mrs. Gray suffered her first thoracic fracture, the standard of care required a reasonably prudent internist to further investigate potential causes of the refractory anemia and thoracic fracture. Specifically Dr. Dimitriades should have done further testing to determine protein levels in the blood and urine such as a serum and urine electrophoresis. Had Dr. Dimitriades conformed to the standard of care, I opine to a reasonable degree of medical certainty that he would have documented results that would have led to further studies to confirm the diagnosis of multiple myeloma. Other studies that would have documented Multiple Myeloma such as a bone marrow examination . . . would have

14

confirmed a diagnosis of multiple myeloma.

¶35.   However, Dr. Dimitriades *did* "investigate potential causes" of Gray's "first thoracic fracture." He referred her to Dr. Graham, who performed a biopsy, the results of which were normal. The record also reflects that Gray was referred to Dr. Frieze for treatment of post-menopausal osteoporosis.

¶36.   Gray had follow-up appointments with Dr. Dimitriades in May, June, and September of 2009 and January of 2010. Dr. Avery asserts that—even though Dr. Dimitriades had received test results indicating that Gray did not have cancer, and even though Gray was referred to both an orthopedic specialist and an endocrinologist—Gray's continued anemia during this time period compelled Dr. Dimitriades to order "further testing to determine protein levels in the blood." The results of these initial tests supposedly "would have led to further studies" and an eventual diagnosis of multiple myeloma.

¶37.   In connection with Dr. Avery's opinions that Dr. Dimitriades breached the applicable standard of care, we note that in January 2010, Gray stopped seeing Dr. Dimitriades and began seeing a different family medicine physician, Dr. Kerby. Gray saw Dr. Kerby in January, May, and June of 2010, but there is no evidence in the record that Dr. Kerby independently diagnosed Gray's multiple myeloma or ordered any of the tests that Dr. Avery contends were necessary.[3]

---

[3] As noted above, in June 2010, Dr. Kerby informed Gray of the results of her May 2009 biopsy. The record does not explain how Dr. Kerby became aware of those results.

¶38. Against this backdrop, we conclude that Dr. Dimitriades was entitled to summary judgment for essentially the same reasons as Dr. Frieze. Dr. Avery's affidavit fails to explain why it was not reasonable and prudent for Dr. Dimitriades to rely on a normal biopsy—the only biopsy of which he had notice—and MRIs that showed no lytic lesions. Nor does he explain why it was not sufficient for Dr. Dimitriades to rely on referrals to an orthopedic specialist and endocrinologist. Finally, Dr. Avery does not explain what the results of tests to determine protein levels would have told a reasonably prudent physician in Dr. Dimitriades's position. As stated above, a conclusory expert affidavit that fails to explain the underlying "how, when, and why" is insufficient to withstand summary judgment. *Perez*, 75 So. 3d at 611-12 (¶¶13, 16) (quoting *Dalton*, 20 So. 3d at 1234 (¶16)).

¶39. In addition, as in the case of Dr. Frieze, Dr. Avery fails to explain when Dr. Dimitriades should have first ordered "further testing" or how long that multi-step testing process would have taken. We have held that a medical malpractice claim "must fail" in the absence of "expert medical testimony that articulates the duty of care a physician owes to a particular patient under the circumstances *and identifies the particular point that the physician breached that duty and caused injury to the plaintiff*." *Potter v. Hopper*, 907 So. 2d 376, 380 (¶10) (Miss. Ct. App. 2005) (emphasis added). As explained above, in *Gray v. Graham*, Gray was able to survive summary judgment on the issue of proximate causation because the date of the Grahams' negligence could be pinpointed to a particular date, and there was evidence that Gray's additional injuries occurred subsequent to that date. In this

16

appeal, in contrast, all that Dr. Avery can say is that Dr. Dimitriades (allegedly) should have diagnosed Gray by some unspecified later date, and there is no basis for a reasonable juror to find that such a diagnosis would have prevented Gray's additional fractures. As stated above, "proximate cause requires more than speculation, guesswork, conjecture, or inferences." *Martin*, 90 So. 3d at 50 (¶18). Therefore, Gray failed to create a genuine issue of fact on the issue of proximate causation.

## CONCLUSION

¶40. The circuit court correctly concluded that Dr. Avery's affidavit failed to support Gray's allegations that Dr. Frieze and Dr. Dimitriades breached the standard of care and proximately caused injury to her. Therefore, the circuit court properly granted summary judgment in favor of those defendants (and Dr. Dimitriades's employer, MHG).

¶41. **THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.**

17